Page 17-5970 and 17-6033 Tennessee Hospital Association et al. v. Alex M Azar II et al. Oral argument, 15 minutes per side. Ms. Morrissey for the appellant, Carlsbad Police. May it please the court, Tara Morrissey for the government. I'd like to reserve 5 minutes for rebuttal. In the FAQs, CMS clarified that compensated costs are not uncompensated costs. This policy is an interpretive rule because it explains how the Medicaid shortfall applies to a particular subset of Medicaid patients. It's also the only position that is consistent with the rule's preamble and with the purpose of the Disproportionate Share, or DSH, hospital program. Well, it might be consistent with the preamble, but it's not consistent, it seems, with the very straightforward language of the 2008 rule, which says this uncompensated thing is total cost of care less the sum of regular Medicaid rate payments, pretty simple, Medicaid managed care organization payments, supplemental enhanced Medicaid payments, uninsured revenues and Section 1011 payments. I mean, that's really straightforward. And that's material, I mean, it's just not the same thing. The FAQs are adding on to that. So maybe it's consistent with the preamble, but that didn't go through notice and comment. This reg did. That's correct, Judge Kethledge. And if I could direct the Court to page 24 of our opening brief, where the basic outline of the Medicaid shortfall is set forth. The paragraph you've pointed to, that includes the Medicaid shortfall, it includes the uninsured component as well, and it looks, I think, more complicated and detailed than it is. When you look at the Medicaid shortfall, it's also pretty straightforward, but basic. Paragraph. So on page 24 of our opening. Is that a paraphrase for the statute or the reg? No, it's paragraph C11 of the regulation. C11, okay. And we have the sort of chart at page 24 of our opening brief. Are we talking about the 2008 reg? Yes. Okay. So paragraph C11 describes total Medicaid uncompensated care. The rule also refers to that as the Medicaid shortfall. And that is the difference between costs incurred in paragraph C10, costs incurred by each hospital for furnishing services to Medicaid-eligible individuals, minus the total Medicaid payments in paragraph C9. Okay. That's not including third-party insurers. It doesn't say anything about third-party insurers. We still don't have a whisper about that, and yet somehow that's the law of the land. What it says is uncompensated care. And what we know we're determining, Judge Kethledge, is a Medicaid shortfall. And the reason that the regulation spells out the Medicaid payments is that we are determining how far does Medicaid fall short of covering the hospital's costs. And paragraph C10 refers to costs incurred by the hospital. That language is naturally susceptible to a reading that reflects offsetting payments. I mean, costs. So, I mean, this really goes back to the statute and the G1A provision. And, you know, costs, I mean, that's a real simple term. It's outlays. It's money spent in providing care. And then that's what it means. I mean, that's the ordinary meaning of it. Judge Kethledge, we've cited quite a few cases in our brief in the context of Medicare and Medicaid where costs incurred. Every judge that has heard this argument has rejected it. That's correct. No court of appeals has ruled on this statutory question, however. And I would submit that if this court is inclined to disagree with us and think that this policy should have gone through notice and comment, that the statutory question would be better addressed in the context of a rule that has gone through notice and comment, such as the 2017 rule. Well, that's down the road in terms of how we write something. But to your question about costs incurred, costs incurred in Medicare, that language is used in the statute. And courts have held, including in the Kindred Hospital Association case in the Eighth Circuit, that that cost is not incurred if it is reimbursed. So it is susceptible to two meanings. Reimbursed costs, but it's incurred. And we know from the statute. Let me understand. If that's your position that the statute says, then what evidence have you presented that would show that you required hospitals to net out these third-party payments, the particular ones that we're discussing, before you issued the FAQs? In 2008, the agency, contemporaneously with the 2008 rule, explained that in the context of Medicare payments, a commenter said, well, these payments, what do we do with the costs and payments for these patients? And the commenter assumed that you just don't count the costs or payments for these patients at all. And CMS responded that, no, there is no exclusion in the statute for Medicaid patients who have third-party insurance. And it's a calculation of uncompensated costs. So, of course, you count the costs. That was in what kind of a response? That was in the preamble, Your Honor. So the preamble to the 2008 said that. Yes. But the preamble is not through the rulemaking. That's correct. It is the agency's contemporaneous explanation. I'm asking about who did you go after? Who did you say, you are not, you're not, you are incorrectly analyzing what needs to be deducted? And now you owe us money, for example, which is what you began to do after you issued the FAQ. Sure. But if that was what the statute said, then you should have been doing it before. So tell me what you did before, where in the record or in your sworn statements, do you show that you were already actually going after people who did not do it the way the FAQ suggested? Judge Strantz, the first time that CMS received audits that would have been subject to recoupment was 2014. The auditing and reporting requirement was not enacted until 2003. And the rule implementing it was promulgated in 2008. The first audits were not submitted until 2009. And there was a grace, sort of a transition period there. So until, well, it was 2011 was the first year that either states would have to redistribute the money among other hospitals, sharing in this limited pool. So the condition is that you had a requirement in the statute, but you didn't require the provision of information so you could test to see whether people were actually complying with the statute until much later. Right. It was 2003 in the auditing and reporting requirement that Congress said that states need to start submitting these audits to ensure that, and in paragraph J it states, only the uncompensated care costs are included. And the history to that. Sorry, please finish your answer. The history for that provision shows that Congress wanted these dish payments to help hospitals meet the costs of treating Medicaid patients without exceeding their net costs. And it wanted to help hospitals that don't treat large numbers of privately insured patients. Plaintiff's approach is doing exactly the opposite. It's allowing hospitals to exceed their net costs, and it's giving hospitals who treat a large number of privately insured patients or Medicare dual eligible patients at the expense of other hospitals who are sharing in this limited pool of hospital payments that are available within Tennessee. The record shows that St. Jude, for example, had $79 million in uncompensated costs in 2012. I'm sorry? There's no question that's concerning because it indicates that the very purpose for which this was created would be undercut if you don't do the calculations as you suggest they should be done. But I think what we have to understand is when did you, when did the government enter that analysis and enforce that analysis? And it sounds to me like what you're saying is the first time really was the 2008 period in the information that came with, in the preamble. I'm just not seeing any enforcement prior to that. That's the first time the issue was really, really straightforwardly raised. Why didn't you just say it in the 2008 reg? You list four things. I mean, it would have been so easy to say third-party insurers. The regulation could certainly be third, Judge Ketledge. It was a calculation. It just doesn't say it. It's a calculation of uncompensated costs. How would a hospital know that they're supposed to back that out based on the reg? I think the hospital looks at it and says we have an obligation to report uncompensated costs, and we have this massive compensated. Here's like the original mistake in all of this, which is uncompensated costs, if, as a matter of ordinary meaning, I would be totally sympathetic to what you're saying here. But uncompensated costs, the whole point of G1A is to define that term and to give us a formula. And that formula, very interestingly, that provision expressly mentions third-party coverage, third-party payment, but never includes that in the payments that must be considered in determining the net. And you're just trying to bake that in there. And if you can read costs incurred, not to mean outlays, which is what it normally means, but to mean outlays minus third-party payments, then why would Congress then spell out net of other payments that need to be backed out if we're already doing some kind of net in the meaning of cost incurred itself? It's nonsensical as an interpretive matter. May I respond? Yes. Judge Kethledge, there is an express delegation of authority to the Secretary to define that term. Net of payments is a limitation on the Secretary's authority to define costs incurred. We know just from looking at the parenthetical that costs incurred can't mean gross costs because as determined by the Secretary, a net of payments are both descriptors of that term. They are both in the same parenthetical. Costs incurred as determined by the Secretary. There are a lot of different outlays that hospitals do. You're paying the surgeon, perhaps, that is operating on the patient. You're paying other people there. You have overhead. You have general operating costs. That's the sort of stuff that's spelled out a couple provisions later in WW. And it's those costs. I mean, the natural reading of this is it's those costs that the Secretary, in her expertise, can decide count towards the outlays for Medicaid patients or don't. It's not to make up some hitherto completely unheard of idea of what a cost is. Judge Kethledge, that reads costs incurred to reflect gross costs, and I don't think it's capable of that meaning here when we know that net of payments is actually describing costs incurred. We know that that we're looking at an aggregate amount. What are the costs incurred? And we know that that's already net of some payments. So to circumscribe the Secretary's authority to just define gross costs is ignoring the whole context, and it's ignoring the subheading, which describes uncompensated costs, and the language in J2. Begging the question what that is. But anyway, I'll relent, and I know we've gone over time. Do I still have rebuttal? Okay. Thank you. Good morning. I'm William West here on behalf of the Tennessee Hospital Association and the hospitals in this matter. And I wanted to take a little bit of exception with the prior speaker because she says it's not gross costs. There is a declaration from a senior CMS executive in this record. It's the Ms. Kristen Phan's declaration at Document 42, and at page 557 of the record, the third page of that declaration, she says that the column J, which is the total of correspondence to subsection C10 of this rule, 447.299C10, that that is gross costs. She literally uses that term. And so as practiced in the 2012 audit, which is the one by which the CMS seeks to take back the money from the hospitals, their own senior executive says, oh, yeah, we use gross costs. So the question is, why did they do that? Well, they did that because that is the way the regulation is set up. If you look at the 2008 reg, and I think Judge Kethledge, you touched on this earlier, what you have to remember is not only do the hospitals have to subject themselves to an audit that the state gets the audit done and they package it, they do a report called a data element report along with it. And that's required by the statute and regulation. And then they report on that, which is not G1A, but it's the next section, the J subsection. They report on that and they give that to CMS. CMS looks at that and says, okay, we can determine from this chart and this information, this audit, who got overpaid with DSH funds. And what they did was in that data element report, which is a spreadsheet, which is also attached as Exhibit B to Ms. Phan's declaration, is also an attachment to Ms. Van Cleave's declaration in the record on behalf of the Hospital Association. There's a very detailed spreadsheet that I had to magnify in order to be able to read, but it has a series of headings across the top. There's a list of about 20 columns. And each of those headings ties back to a specific subsection of 447.299C. So when we say C10, referring to the regulation, that's column J on this spreadsheet. So when Ms. Phan says column J has gross cost, she's talking about C10, which is the total cost of care for Medicaid inpatient outpatient care. Am I right that C10 says total annual costs incurred by each hospital for furnishing services to Medicaid eligible individuals? Yes. The title I was giving it was off the chart. I think that's from the regulation. And that's the regulation as it existed that we're trying to interpret? Yes. So why doesn't that have the possibility of being total annual costs incurred by each hospital for furnishing services? If they furnish services to a Medicaid eligible person who is actually getting Medicare and Medicare is paying for it, why would the total costs incurred by the hospital be Medicaid costs if Medicare is paying for it? Because that is the way Congress set up the statute and the way the regulation itself is set up. Logically, though, you don't have an answer. Well, I do have an answer. And it ties back to the legislative history. Because in the legislative history of G1A, which was 1993, the legislative history says, mentions only deducting Medicare, when it comes to what we call the portion of the DSH calculation that's limited to Medicaid. That's only, it only says you can deduct the Medicaid payments that were made on behalf of these. Okay. So we really want to get to the statute, which I'm so glad you took us there. So G1A says that the DSH payments may not surpass the costs incurred as determined by the secretary, which is what the government's relying on, and net of payments under this subchapter, and by uninsured patients. So it doesn't list your, it doesn't list Medicare. It does say specifically payments by uninsured patients. So that is a specific thing. But why isn't, as determined by the secretary, broad enough to cover, if the secretary so chooses, properly, Medicare and payments by insured people? Well, my first component of my answer is that the legislative history doesn't call for it. The statute is silent on it. The statute is pretty clear that it's as determined by the secretary. Yes. But it does not mention it. And the statute draws, and I think this is reflected in not only Judge Crenshaw's decision, but in the decision by Judge Sullivan in the District Court of the District of Columbia, and by the judge in the Missouri Hospital Association case. The statute is clear as to cost and payments. And the Judge Crenshaw's analysis was, and we think he's right, that the statute is specific about the payments that can be used. To broaden that to include other payments is beyond the scope of the statutory terms. The as determined language comes immediately after this phrase about costs. Costs incurred during the year of furnishing hospital services. As determined by the secretary comes after that. It's only after the as determined by the secretary that we have payments. So I don't see how as determined by the secretary could modify the payments. It's not the secretary's discretion as to what payments can be considered in this net. It's only the kinds of costs, which would make perfect sense, because hospitals have all kinds of costs. Maybe they can't attribute a share of everything to a Medicaid patient. Well, I agree with that in the sense that only payments can be deducted from the, only Medicaid payments, for example, under the shortfall can be deducted from the cost. And there's no statutory. Well, as Judge Crenshaw pointed out, it's up to Congress to decide the policy. But I'm just asking, if we read the statute your way, we would have to say that Congress has made some sense here. Whereas if we read the statute the way I was offering as a possibility, there would be the opportunity to deduct the costs of a person who is, say, wholly paid by Medicare, and where Medicaid is not paying anything even though the person qualifies for both. And I'm just wondering why your view would make sense. Because we have to assume Congress makes sense. Yes, Your Honor. But, again, I go back to the legislative history. What in the legislative history supports your view that it's right for the hospitals to count the costs, the ephemeral, the imaginary costs that were possibly incurred for Medicaid-eligible but Medicare-paid patients? If I may, Your Honor, I would disagree with the ephemeral adjective there because these are a cost. I mean, the costs are identified. And let me back up a step and just point out about the DSH process. Hospitals don't bill Medicaid for DSH payments for each patient that comes through or whatever. Their data is, each hospital's data is aggregated and analyzed by the  And I don't want to ruin the record because we had an issue about when the Tennessee fiscal year ended because we were coming up against that. And that's why Judge Crenshaw issued a temporary injunction in early June to sort of slow things down so he could make a ruling on this. And so those are costs that are incurred in the sense of the hospital had the cost and paid for it or whatever. Whoever had billed for the cost is separate. But the hospital incurred in the sense of it was exposed to the financial obligation to pay the cost. But I'm asking why does it make any sense to say, for instance, that you're going to put to one side the cases of uninsured patients, but you're not going to let the secretary say, hey, people who are paid by their, whose costs are paid by their insurer, if they have Blue Cross, or people who are paid by their Medicare are not the same as the situations where there were payments by uninsured patients? I mean, it just seems logical to me that the secretary should be able to decide. I'm looking for an answer as to why, as a matter of logic, treating the Medicare people the same as the uninsured people who make payments. I could give you an answer as a matter of law. And the logic, I think, is reflected in some of the cases which say, you know, it's clear, and Congress understands, that it's not, when it makes Medicaid distributions to hospitals that comes through CMS, those payments do not cover all the Medicaid costs. And that's just sort of a... Only a portion of it. Only a portion of it. And so I think Congress thought, to the extent we can, and we can afford it, we are going to do what we can. And this portion of shares, you know, is a supplemental payment that, as I said earlier, it's not tied to any specific patient. So I think that, as a policy reason, is why Congress did it this way. Can you explain also, the reg in 2008, it's my understanding, and correct me if I'm wrong, excluded Section 1011 payments? From the DSH calculations? I'm not an expert on Section 1011, but I think it's a program that pays for health care for aliens. Yes. And is that provided for in the statute G1A? No. No. Maybe that's a problem, too. So how could the rule in 2008 provide for something that was not in the statute, under your interpretation? How could it not be? It's not in the closed class. My understanding is that you're saying it's a closed class. It's Medicaid payments and it's uninsured payments. That's what Congress decided. But what I think gives us concerns is that nobody is disputing 1011 payments. We have an example that shows that it's not a closed class. And in that, if it's not a closed class to this by admission of all the parties, and by no challenges to the 1011 payments, then how can the Secretary's determination, which included the capacity to have 1011, not include the capacity to add other things? Well, as a practical matter, as you can see reflected in the 2012 audit, there are no 1011 payments. That doesn't answer your question. It doesn't answer the question because either it's a closed class or it's not. And once we decide that issue, then we can decide what the Secretary had the right to add. And it appears that it is not a closed class, so now we're in a different ballpark. We're asking whether the Secretary's exercise of her authority was appropriate. Well, that provision of the rule may also be subject to the same challenge. Because we had no, there were no financial reasons for my clients to pursue that. My understanding of the actual record in the larger context is that there were comments about the 1011 payments challenging them initially, and the government responded that this is an appropriate deduction, and no suits were brought. Suits brought here, but not on 1011. If that was in the preamble, then as the First Circuit noted, the preamble doesn't have the effect of a rule. If what was in? The 1011 comments you're talking about. I understand you say that there were comments asking about the 1011 payments. Yeah, I think that was previously. And I can't tell you frankly exactly when it was. I understood it was some sort of earlier rule, that there was this back and forth. But what we're talking about is what does the statute say about the class and what has actually happened about the class. And I think that what has actually happened about the class indicates that it's an open class. And if it's an open class, why can't the Secretary make the determination that other payments coming to the hospital to offset its cost get to be calculated in that formula? I return again to the principle adhered to by Judge Crenshaw and the other trial judges that have held this way, that I think the judge in the Missouri case had it that the Secretary has delegated the capacity to determine which payments can be used. Those are set out in the statute. And what is 1011? It would apply. No, I think if someone were to challenge it on that basis, they would not be utilized either. You say nobody, no money has been, 1011 has not affected any payments to hospitals. In Tennessee. So nobody would have a reason to bring a challenge as to 1011. Surely you would agree that the failure of private parties to challenge a particular action of the Secretary, namely inclusion of 1011, does not empower the Secretary to promulgate a regulation that exceeds the scope of 1011? I agree with that, yes. If I may, just very briefly, I was just kind of holding off. One thing I wanted to ask, kind of in line with Judge Moore's questions about why would this make sense, is it your understanding that under 1396 R4A2D, so this is earlier in the same statutory section, it talks there about the role in determining which hospitals get these supplemental payments and how much of that money they get, is that correct? Yes. And A2D refers to the state's methodology to, quote, identify and make payments to disproportionate share hospitals, being the ones that disproportionately treat Medicaid and uninsured patients. Is it your understanding that the state would have, the state of this provision in developing its methodology, could choose not to reimburse hospitals for costs, and I use that in the ordinary English sense of the term, costs for which some third party, Blue Cross, et cetera, has reimbursed it already? I think that particular section, if I have it correctly, refers to an early, in the early process of the DSH funding cycle, there were some extra funds that were being sent out to particular types of hospitals? It's a general provision, if I understand it correctly. Okay. I could be, that's kind of why I'm asking. It seems, I mean, my point is, it seems that this allows the states considerable flexibility, because it's not very constrained, to develop a methodology about, as among the eligible hospitals and the eligible uncompensated costs, as defined by G1A, the state then gets to exercise some judgment about where the money goes. As I understand it, the state does have some authority granted by CMS to allocate the fund. The funds are specifically designated in statute. Like Tennessee, for example, has a, there's a statute, federal statute affecting Tennessee that specifies that Tennessee receives X amount of DSH funding out through, per year, out through 2025. The state does have some power to segregate hospitals into different groups and to allocate DSH funds, but every state, for every fiscal year, will be audited according, just like in 2012, for example. The CMS, the statute requires us, requires the states to have an independent audit, and they have to approve the auditor, which we use the, they use the auditor, who's audited a lot of states in this case. So, and the, as you can see, if you, in the record, as you follow, the actual instructions from the auditor to the hospitals, for example, is to develop the audit, in this case, in 2012. The instructions are in the record. It was a PowerPoint display that they gave. And there are specific instructions flowing through from CMS saying, for example, saying, we will enforce, or that's not quite the way they put it, but FACT 33 and FACT 34 have to be applied. So there's specific controls. Well, I think, I think we've covered the question. I have, if I might, a follow-up question to that. So, am I correct in understanding that it, I understand that it runs  through the entire, that's where the, there's a compilation of data based on all hospitals within the state? Yes. Right. So the money that your hospitals were said to owe back, if they don't owe that back, your hospital keeps that. Is that correct? Yes, that's correct. So if you are in a more well-to-do area, and you have more covered patients who also have individual insurance, then doesn't that, if you do not accept what the government has suggested, isn't the practical outcome of that, that rather than helping the hospitals that truly deliver free care with higher DSH payments, you are in fact giving higher DSH payments to the hospitals that are fortunate enough to have people who have private insurance? I think the record, if I may answer, the record in this case shows that effectively is not the case, because. I thought St. Jude's, who gives a great deal of free care, was, did not have comparable DSH payments to it, as compared to your facilities, which have more private insurance payments that are not deducted. I cannot recall standing here exactly what the level of DSH payments were to St. Jude's, but my understanding is the government's complaint is not that St. Jude got none or got very little, but that they had a higher load, which of course everybody knows they serve a worldwide population of patients. But St. Jude's also has a large, a related large private insurance payment private foundation that raises significant funds for them. So they may show these costs, but if you. They have to go out and raise it. Right, and I think. I'm trying to get to the purpose, the whole purpose of this and the questions about double dipping that came from Judge Crenshaw, and are clearly part of the issue of what's going on here. I'm struggling with whether allowing the receipt of these insurance, private insurance payments, and to be retained. It's not that you don't want hospitals to be helped, because we all know how desperate the need is to support hospital facilities everywhere. But I'm wondering the underlying policy to make sure that those hospitals that  have no reimbursement, isn't the goal of this plan to see that they receive the lion's share as opposed to the hospitals that have a private insurance base? I think that is a goal, and I think they do receive those. For example, Delta Medical Center, one of our plaintiff hospitals, it's in a poor neighborhood in Memphis, but they have one of the highest Medicaid inpatient utilization rates in the state. That's another category that's reported on this report. And I think Tacoma Regional, which is up in East Tennessee and Greenville, similarly has a relatively high Medicaid inpatient utilization rate, and both of those serve significant volumes of indigent patients. I think all hospitals in Tennessee do. But this report gives a ranking, or data on that, and I think, for example,  they got a little less than a million dollars. The 2012 audit would have caused them to pay back about $990,000. And I think Tacoma Regional was $300,000 or so. And for Tacoma Regional, which is a small nonprofit hospital in East Tennessee, all of these hospitals, those two especially, they ran at a loss, I think the record shows, in 2012. So the theory of the government here was that those hospitals that you're mentioning that are your clients had reimbursements for the care of people who qualified both for Medicaid and Medicare. They had reimbursements from Medicare that took total care costs away from Medicaid having to pay. And so then the question that sort of builds on Judge Stranch's is, is there a set pot of money for DSH payments to go to the hospitals in Tennessee? Is it a closed amount such that if your position wins and your hospitals receive the money, that other hospitals will not be able to receive money? Is that a fact that's true here? There is a set pot of money. It's federal funds for about 65 percent of TennCare payments, which TennCare is our Medicaid program, and 35 percent roughly of the state payment to match, state matching funds. But if you look at the data element report in Ms. Vann's declaration, also Ms. Vann Cleaves, clearly all of these, the hospitals receiving these sums, like Vanderbilt University Medical Center, for example, there's a 2014 data element report in the record too. Now that's a large institution, but no one can dispute they do a lot of charity work with their children's hospital and so forth. They will be forced to repay for the 2013 audit, I believe it's about $8 million, which if you say, well, that's not much to Vanderbilt, I think that is a significant amount. Say hypothetically there's $100 million to be spent on DSH payments in Tennessee. So if Vanderbilt were to pay back $8 million, does that $8 million then go to the other qualifying hospitals to increase their DSH payments? Only if they have not received the Medicare or the... No, I think what I'm trying to say is my understanding is any recapture, the state has to recapture it because if they don't, the CMS will reduce their Medicaid payments until they make it up. But I think that the instructions to the states, as I understand it, are to pay them to any hospital that may not have received its share of DSH. I don't know how that's identified because we haven't seen that. But then the leftover funds, and so this is all in the regulations, they presume the regulations assume there will be leftover funds in many states. They go back to CMS for Medicaid purposes in the sort of global budget, as I understand it. One more question and then we'll let it go. I'm glad I don't have to rebut. If the injunction were repaired as you requested to not have the limitations and remain tied to the FAQs, in other words, if we only looked at count two, you would receive all of the remedy that you are requesting. Isn't that correct? Yes. Let me clarify. Our cross appeal asks for the elimination of the 2000, the injunction Judge Crenshaw put down. Ended in 2016. You want to go on. Yes. And I would say also, all our discussion today has not touched on the APA violations, at least to any great extent. And I think that regardless of the statutory interpretation issue, the APA has been violated here. And that alone is sufficient grounds for the injunction. And there was no explanation or justification by Judge Crenshaw of why he ended it at the end of fiscal year 2016. But my question to you is, like the First Circuit, could we not say the FAQs are a failure of notice and comment? That's a violation. There's a permanent injunction. You would get all of the remedy that you sought without any need to address the substance of the statute under count one, correct? Yes. And that's what the First Circuit did. That's actually what the circuits have done that have addressed this. That's true. Except for the 2017, which is now pending on appeal before the D.C. Circuit. Yes. That's right. And that would be sufficient to protect my clients against facts 33 and 34, which is our goal. Judge Crenshaw did address the substantive interpretive question. Yes, he did. The district courts that have heard these cases addressed both. The circuit courts addressed only the FAQs, right? Except for now we're before the D.C. Circuit. That's right. And that's why we withdrew that claim when it became clear. Yes, I would say I believe you all are the third circuit court to hear argument, if I'm not mistaken. I think there was one yesterday. I appreciate your time. Thank you, Your Honors. Judge Moritz. Yes. Why with the issue of the 2017 alteration, which fully explains the government's position, with that pending before the D.C. Circuit, with the full background in that case, why would the most practical thing, if we were resolving it in your opponent's favor, for example, to go only on count two, limit it to the FAQs being a violation of notice and comment requirements, why would there be a need to address the substantive statutory provisions? Judge Strange, in that unfortunate situation for us, there would be no need to address the substantive question. Courts of Appeals have held that when there is a procedural defect in an agency policy, it is appropriate to not short circuit the notice and comment process, and to wait for an actual notice and comment rule in order to really fully assess the validity of that rule. There's additional reasoning. It's a clear Chevron case. There's just no need to reach it. My understanding of your argument as to why there's no APA violation here is that, and again, the 2008 reg says, total cost of care less the sum of four discrete things, none of which include private insurance. And you're saying, as I recall your argument during the first round, you said, well, the cost of care itself incorporates a net of private payments. And that's why, even though it's not spelled out there and frankly nobody would know it, that's why this 2008 reg does the legislative work of denying or including third-party insurance payments in the amounts that are backed out from what the supplemental payments can reimburse. Now, it would seem like, if that's the government's argument, it would seem that we do have to address the question whether you're right that the word cost is a net concept in the statute and not its ordinary meaning. You referred to the statute as the basis for reading total cost of care, not to mean outlays, but outlays minus certain costs. I mean, you're relying on the statute for that, and that's baked into the procedural issue. I think, Your Honor, the notice and comment question is really an interpretation of the regulation. And so the question is whether it adds something substantively new to the regulation and whether that should have been promulgated through notice and comment. I don't think you need to reach the actual statutory question. Judge Crenshaw reached both. Judge Crenshaw reached both. One other district court has. The other district courts have not. New Hampshire did not. The First Circuit did not. The First Circuit did not, but didn't the district court? No, it didn't. Judge Crenshaw, and we've explained in our reply brief, did not actually reach the statutory question. It simply said there would be a violation of the statute because the policy wasn't promulgated through notice and comment rulemaking, but it didn't decide whether. So your argument is that this is interpretive, not legislative. Exactly. But if it's interpretive, then we've got to worry about the statute. But if we decide that it's legislative, you've missed notice and comment, and that's it. That's right. There's a violation irrespective of what we would say the statute says. Yes, that's absolutely correct. And Judge Moore, you're correct that it's a closed universe. And Judge Strand, you're absolutely correct that the plaintiff's approach here benefits hospitals that have Medicaid populations that are wealthier and better insured. This is an open class, as you described. The negative implications are not warranted here for several reasons. Medicaid payments are specifically called out because we're calculating a Medicaid shortfall, and Medicaid is the most natural source of payment for Medicaid patients. It is also just in general a weak presumption in the administrative context to assume that there's some negative inference that should be drawn, as opposed to leading that question to the agency. Especially when it would undermine the purpose of the regulation and the statute, and especially when it would treat compensated costs as uncompensated costs, which is directly counter to everything. Yes, but I think those also apply to the interpretation of the regulation as well. Both situations we're drawing negative inferences from. Is the D.C. Circuit considering the substantive issue or only the procedural one? We've only just filed a docketing statement. But it's dealing with the 2017 rule, which went through notice and comment. So there's not a legislative... I'm sorry, yes. That's correct, Judge Moore. Thank you. It's a cleaner record. This is my last question for you. Would you agree, Ms. Moore, that under A2D, the state in determining its methodology for apportioning these supplemental payments among eligible hospitals, that the state could choose to give less to hospitals that have received third-party payments for Medicaid costs? States certainly have broad discretion in determining how to allocate funds, and I haven't been confronted with that particular question. This problem could be addressed at the state level? Certainly the state could reallocate funds under the state plan. The purpose here was for, as Congress stepped in as a federal matter, because things weren't going as it expected. Very subtle of that. Thank you very much for your response. Is there anything in the regulations in C where we've been talking about C11, total Medicaid uncompensated care, and C10, total annual costs? Is there anything that defines either compensated cost or uncompensated cost? In the regulation? No. We know that Medicaid uncompensated care equals the costs incurred minus the Medicaid payments, but nothing that expressly defines those terms, no. Thank you. Thank you both for your argument. The case will be submitted.